Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-02677-LTB

TAD L. JONES SPOUSAL LIMITED ACCESS TRUST, et al.,

      Plaintiffs,

  v.

BIG CYHAWK HOLDINGS, INC.,

      Defendant.

---

### DECLARATION OF JAMES RAHFALDT

I, James Rahfaldt, do depose on oath and state as follows in support of Big CyHawk Holdings, Inc.'s Motion to Dismiss for Improper Venue:

1.    I am over the age of 18 and am a resident of the State of Oregon.

2.    I have personal knowledge of the facts stated herein, and, if called as a witness, could testify completely thereto.

3.    I am the President of Big CyHawk Holdings, Inc. ("**Big CyHawk Holdings**" or the "**Company**"), the Defendant in the above-styled matter. Big CyHawk Holdings is a corporation registered in the state of Iowa, with its principal offices in Sioux City, Iowa.

4.    On December 31, 2012, the Tad L. Jones Spousal Limited Access Trust (the "**Tad Trust**"), the Monica L. Jones Spousal Limited Access Trust (the "**Monica Trust**"), and I each executed the attached Shareholder Agreement. As noted on page 1 of the Agreement, at the time of its execution, I was the record owner of 650 shares of the Company's common stock, while

1

the Tad and Monica Trusts were each record holders of 175 shares of the Company's common stock.

5.      In August 2013, Jerry MacDuffey acquired a 10% interest in the Company.    At present, I own a 55% interest in the Company, the Tad and Monica Trusts each own a 17.5% interest in the Company, and Jerry MacDuffee owns a 10% interest in the Company.

6.      Big CyHawk Holdings's assets consist almost entirely of its ownership interests in two Iowa entities:   CyHawk Hospitality, Inc. ("**CyHawk Hospitality**"), and Big Game Enterprises, LLC ("**Big Game**").   These entities own and/or operate thirteen Perkins Restaurant and Bakery stores, including five stores in Iowa and four stores in Colorado.

7.      In or around the summer of 2013, it was discussed among and agreed by the shareholders of Big CyHawk Holdings that additional funds would periodically be necessary to finance the operations of CyHawk and Big Game, including for land acquisition, the construction of stores, and equipment purchases.

8.      It was further discussed among and agreed by the shareholders that each shareholder, including myself, would contribute funds when requested by Big CyHawk Holdings in an amount proportional to their ownership interest in the Company.

9.      As President of Big CyHawk Holdings, I informed the shareholders in or around December 2013, February 2014, August 2014, and November 2014 of the need for additional funds and of the amount each shareholder would be expected to contribute.

10.      Big CyHawk Holdings requested these contributions from the shareholders specifically because of their status as shareholders and their ownership interest in the Company. These requests would not have been made of the shareholders but for their ownership interest in

the Company. No individual or entity other than the shareholders was ever included in these requests.

11.     Each shareholder, including myself, made the contribution of funds as requested in proportion to their ownership interest in Big CyHawk Holdings. Specifically, I contributed a total of $618,750, Jerry MacDuffey contributed $112,500, and the Tad and Monica Trusts collectively contributed $393,750.

12.     The funds that the shareholders contributed were used for various purposes, including to finance the acquisition of land for and construction of stores in Gardner, Kansas (Store No. 5145); Altoona, Iowa (Store No. 5146); and Hastings, Nebraska (Store No. 5147);to purchase equipment for these stores and an additional store in Colorado Springs (Store No. 5150); and to purchase the business and equipment of three other Colorado stores (Stores Nos. 5151, 5152, and 5153).

13.     The amount of funds contributed by the shareholders that was used to purchase equipment for Stores Nos. 5145, 5146, 5147, and 5150 and to purchase the business and equipment of Stores Nos. 5151 through 5153 exceeded $100,000.

14.     The funds the shareholders contributed were not used for equipment leases of CyHawk Hospitality, or in connection with leases for real property locations of any stores after such real property was sold by Big Game.

15.     When paying interest on the amounts contributed to the Company, Big CyHawk has paid and continues to pay interest to each shareholder in amounts proportional to their ownership interest in Big CyHawk Holdings.

3

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, executed this 19th day of January 2016 in McMinnville, Oregon.

By: _____

James Rahfaldt
1271 NE HWY. 99W
Ste #504
McMinnville, OR 97128

Execution Version

# SHAREHOLDER AGREEMENT

THIS SHAREHOLDER AGREEMENT (the "Agreement") is made and entered into as of December 31, 2012 (the "Effective Date"), by and among Jim Rahfaldt ("Rahfaldt"), the Tad L. Jones Spousal Limited Access Trust, a grantor trust created under the laws of Colorado ("TLJ Trust"), the Monica L. Jones Spousal Limited Access Trust, a grantor trust created under the laws of Colorado ("MLJ Trust")(the TLJ Trust and MLJ Trust collectively, the "Jones Trusts") and Big Cyhawk Holdings, Inc., an Iowa corporation (the "Company")(each of Rahfaldt, the TLJ Trust, and the MLJ Trust, a "Shareholder" and collectively, the "Shareholders").

## RECITALS

WHEREAS, as of the date hereof the Company has 1,000 shares of common stock issued and outstanding;

WHEREAS, Rahfaldt is the record owner of 650 shares of the Common Stock of the Company and each of the TLJ Trust and the MLJ Trust are the record owners of 175 shares of the Common Stock of the Company; and

WHEREAS, the parties desire to enter into this Agreement in order to grant rights of first refusal, co-sale rights, voting rights, restrictive covenants, and buy-sell rights related to the Company and the Shareholders;

NOW, THEREFORE, in consideration of these premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## AGREEMENT

1. **DEFINITIONS.**

    **1.1** "Affiliate" means, with respect to any specified Person, any other Person who or which, directly or indirectly, controls, is controlled by, or is under common control with such specified Person, including without limitation any partner, officer, director, manager or employee of such Person.

    **1.2** "Change of Control" shall be deemed to occur (i) upon the consummation of a transaction, whether in a single transaction or in a series of related transactions, pursuant to which a Person, or group (as that term is used in Section 13(d)(3) of the Exchange Act) of Persons, acquire assets constituting all or substantially all of the assets of the Company (whether by merger, consolidation, reorganization, securities purchase, redemption, transfer or issuance of capital stock or otherwise), or (ii) if a Person or group of Persons (other than one or more of the Shareholders and/or their Affiliates) becomes the beneficial owner (whether by merger, consolidation, reorganization, redemption, transfer or issuance of capital stock or otherwise) of securities of the Company (or any surviving or resulting corporation) representing more than fifty percent (50%) of the voting equity securities (assuming the conversion, exercise or exchange of all options, warrants, convertible securities, or other derivative securities that are then in-the-money) of the Company (or such surviving or resulting corporation).

**1.3** "Code" means the Internal Revenue Code of 1986, as amended.

**1.4** "Common Stock" means shares of the Company's Common Stock.

**1.5** "Contribution Agreement" means the Contribution and Exchange Agreement of even date among the Shareholders, the Company and the Subsidiaries.

**1.6** "Distribution" means (a) dividends or other distributions or payments (including interest payments) with respect to the equity securities of the Company or its Subsidiaries, or (b) the redemption or acquisition of any such equity securities.

**1.7** "Family Group" means for any individual, such individual's current or former spouse, their respective parents, descendants of such parents (whether natural or adopted) and the spouses of such descendants, and any trust, limited partnership, corporation or limited liability company established solely for the benefit of such individual or such individual's current or former spouse, their respective parents, descendants of such parents (whether natural or adopted) or the spouses of such descendants.

**1.8** "Indebtedness" means (a) indebtedness for borrowed money or the deferred price of property or services, such as reimbursement and other obligations for surety bonds and letters of credit, (b) obligations evidenced by notes, bonds, debentures or similar instruments, (c) capital lease obligations, (d) obligations relating to outstanding letters of credit, (e) obligations from any interest rate, currency or commodity swap agreement, interest rate cap or collar agreement, or other agreement or arrangement designated to protect a Person against fluctuation in interest rates, currency exchange rates or commodity prices, (f) obligations under guarantees, indemnity agreements and similar agreements.

**1.9** "Insolvency Proceeding" means any of the following events shall have occurred with respect to the Company or the Subsidiaries: (i) either the Company or any of the Subsidiaries shall have made an assignment for the benefit of its creditors; (ii) either the Company or any of the Subsidiaries shall have admitted in writing its inability to pay its debts as they become due; (iii) either the Company or any of the Subsidiaries shall have filed a voluntary petition in bankruptcy; (iv) either the Company or any of the Subsidiaries shall have been adjudicated bankrupt or insolvent; (v) either the Company or any of the Subsidiaries shall have filed any petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future applicable law pertinent to such circumstances; (vi) either the Company or any of the Subsidiaries shall have filed or shall file any answer admitting or not contesting the material allegations of a bankruptcy, insolvency or similar petition filed against such Person; (vii) either the Company or any of the Subsidiaries shall have sought or consented to, or acquiesced in, the appointment of any trustee, receiver, or liquidator of it or of all or any substantial part of its properties; (viii) sixty (60) days shall have elapsed after the commencement of an action against either the Company or any of the Subsidiaries seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future applicable law without such action having been dismissed or without all orders or proceedings thereunder affecting the operations or the business of such Person having been stayed, or if a stay of any such order or proceedings shall thereafter be set aside and the action setting it aside shall not be timely appealed; or (ix) sixty (60) days shall have expired after the appointment, without the consent or acquiescence of

2

either the Company or any of the Subsidiaries, of any trustee, receiver or liquidator of either the Company or any of the Subsidiaries or of all or any substantial part of the assets and properties of either the Company or any of the Subsidiaries without such appointment having been vacated.

**1.10**    "Person" means an individual, a partnership (including a limited partnership), a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, association or other entity or a governmental entity.

**1.11**    "Shares" shall mean the shares of the Company's Common Stock or Common Stock now owned or subsequently acquired by, or issuable upon conversion to, the Shareholders, whether or not such securities are only registered in a Shareholder's name or beneficially or otherwise legally owned by such Shareholder.

**1.12**    "Stores" shall mean the retail places of business of the Company's Subsidiaries at the locations identified in Schedule 1 attached hereto.

**1.13**    "Subsidiaries" shall mean the Company's subsidiaries, Big Game Enterprises, L.L.C., an Iowa limited liability company ("Big Game"), and Cyhawk Hospitality, Inc., an Iowa corporation ("Cyhawk").

**1.14**    For purposes of this Agreement, the term "Transfer" shall include any sale, assignment, encumbrance, hypothecation, pledge, grant of security interest, conveyance in trust, gift, transfer by bequest, devise or descent, or other transfer or disposition of any kind, including, but not limited to, transfers to receivers, levying creditors, trustees or receivers in bankruptcy proceedings or general assignees for the benefit of creditors, whether voluntary or by operation of law, directly or indirectly, of any of the Shares. The terms "Transferee," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

**2.    TRANSFERS BY A SHAREHOLDER.**

**2.1    Restrictions on Transfers**.

**(a)**    <u>Transfer Restrictions</u>. From and after the Effective Date of this Agreement, no Shareholder may Transfer any Shares except (i) pursuant to this Section 2.1, or (ii) to a member of the Family Group of a Shareholder or a member of the Family Group of an Affiliate of a Shareholder (such Transfer, an "Exempt Transfer").

**(b)**    <u>Shareholder Rights of First Refusal</u>. If a Shareholder (the "Transferring Holder") proposes to Transfer (other than pursuant to an Exempt Transfer) any Shares, at any time from and after the Effective Date, then the Transferring Holder(s) shall deliver a written notice (the "Sale Notice") to the Company and each Shareholder at least thirty (30) calendar days prior to making such Transfer, specifying in reasonable detail the identity of the prospective Transferee(s), the number of Shares to be Transferred and the terms and conditions of the Transfer.  Each Shareholder may elect to purchase some or all of the Shares in the contemplated Transfer at the same price per share and on the same terms and conditions set forth in such Sale Notice (the "Shareholder Right of First Refusal") by delivering written notice to the Transferring Holder(s) within ten (10) calendar days after delivery of the Sale Notice. If more than one Shareholder has elected to exercise its Shareholder Right of First Refusal, each electing Shareholder shall be entitled to purchase, at the same price and on the same terms, a portion of

the total number of Shares to be sold in the Transfer, to be calculated according to the following formula: Number of Shares that an electing Shareholder may purchase <u>equals</u> the total number of Shares to be sold in the Transfer, <u>multiplied</u> <u>by</u> a fraction (x) the numerator of which is the number of Shares owned by such Shareholder, and (y) the denominator of which is the number of Shares owned, in the aggregate, by all electing Shareholders.

(c)     <u>Company Right of First Refusal</u>. If the Shareholders do not elect to purchase all of the Shares described in the Sale Notice pursuant to Section 2.1(b), the Company shall have the right to purchase all of the Shares not elected to be purchased by an electing Shareholder upon terms and conditions which are the same as described in the Sale Notice (the "Company Right of First Refusal") by giving notice to the Transferring Holder within ten (10) days following the expiration of the time period for the Shareholders to exercise the Shareholder Right of First Refusal.

(d)     <u>Co-Sale Rights</u>. If no Shareholder gives notice prior to the expiration of the ten (10) calendar day period for giving such notice following the Sale Notice and the Company does not give notice prior to the expiration of the twenty (20) calendar day period for giving such notice following the Sale Notice, then each Shareholder may elect to sell Shares in the contemplated Transfer at the same price per share and on the same terms and conditions set forth in such Sale Notice by delivering written notice to the Transferring Holder(s) within thirty (30) calendar days after delivery of the Sale Notice, which notice shall specify the number of Shares that such Shareholder desires to include in such proposed Transfer. If any Shareholder has elected to participate in such Transfer, each electing Shareholder shall be entitled to sell in the contemplated Transfer, at the same price and on the same terms, a portion of the total number of Shares to be sold in the Transfer, to be calculated according to the following formula: Number of Shares that an electing Shareholder may sell <u>equals</u> the total number of Shares to be sold in the Transfer, <u>multiplied</u> <u>by</u> a fraction (x) the numerator of which is the number of Shares owned by such Shareholder, and (y) the denominator of which is the number of Shares and Shares owned, in the aggregate, by the Transferring Holder(s) and all electing Shareholders.   The Transferring Holder(s) shall not Transfer any of their Shares to any prospective Transferee if such prospective Transferee(s) declines to allow the participation of the electing Shareholder, unless the Transferring Holder(s) acquires from each electing Shareholder (on the terms set forth in the Sale Notice or Amended Sale Notice, as applicable) the number of Shares such electing Shareholder would have been entitled to Transfer to the prospective Transferee (or, if less, the number of Shares that such Shareholder requested to Transfer to such Transferee).

(e)     <u>Terms of Purchase</u>.  If either the Shareholder Right of First Refusal or the Company Right of First Refusal is elected the purchasing Shareholder(s) or the Company, as applicable, may also elect to make payment pursuant to the following terms, notwithstanding that such payment terms may be different than the payment terms described in the Sale Notice: Ten percent (10%) of the purchase price of the Transferring Holder(s)' Shares purchased pursuant to Sections 2.1(b) or 2.1(c) shall be paid at the closing of the purchase and sale, with the remainder payable in twenty equal quarterly amortized installments of principal and interest, with interest at the prime rate (adjusted monthly based on the prime rate published in the Wall Street Journal or successor publication), plus 1% per annum.  Any payment obligation shall be evidenced by a negotiable promissory note.

**(f)** Consummation of Transfer; Subsequent Proposed Transfers. If Shareholders and the Company do not give notice of exercise of the Shareholder Right of First Refusal, the Company Right of First Refusal, or the Co-Sale Rights prior to the expiration of the thirty (30) calendar day period from the date of the Sale Notice, then the Transferring Holder(s) may Transfer such Shares to any Person on terms and conditions that are no more favorable to the Transferring Holder(s) than those set forth in the Sale Notice at any time within one hundred twenty (120) calendar days after expiration of such thirty (30) calendar day period following the Sale Notice. Any such Shares of the Company not Transferred by the Transferring Holder(s) during such one hundred twenty (120) calendar day period and any such Shares proposed to be Transferred during such one hundred twenty (120) calendar day period on terms more favorable to them than the terms set forth in the Sale Notice (including as to price per share or form of consideration to be received in respect of any share of Shares being sold) shall again be subject to the provisions of this Sections 2.1(b), (c), (d), & (e) prior to any subsequent Transfer.

**2.2     Void Transfers.** To the greatest extent permitted by the Act and other applicable law, any Transfer by any Shareholder of any Shares in contravention of this Agreement shall be void and ineffective *ab initio* and shall not bind or be recognized by the Company or any other Person in any manner whatsoever.

**2.3     Exempt Transfers**. In the event of any Exempt Transfer made pursuant to Section 2.1(a)(ii), (a) the Shareholder shall inform the Shareholders of such Transfer prior to effecting it and (b) the Transferee shall enter into a written agreement to be bound by and comply with all provisions of this Agreement, as if it were an original Shareholder hereunder. Such Transferred Shares shall remain "Shares" hereunder, and such Transferee shall be treated as the "Shareholder" for purposes of this Agreement.

**3.     VOTING.**

**3.1     Election of Directors**. Each of the Jones Trusts (voting together as a separate group) shall be entitled to elect one (1) member of the Board of Directors at each meeting or pursuant to consent of the Company's shareholders for the election of directors, and to remove from office such director and to fill any vacancy caused by the resignation, death or removal of such director. Rahfaldt shall be entitled to elect two (2) members of the Board of Directors at each meeting or pursuant to consent of the Company's shareholders for the election of directors, and to remove from office any of such directors and to fill any vacancy caused by the resignation, death or removal of any of such directors. Any remaining members of the Board of Directors will be elected by the Shareholders voting together. During the term of this Agreement, each Shareholder will vote all of his, her, or its respective Shares with respect to all such matters in such manner as to place and retain the (a) one (1) designee of a majority of the Jones Trusts' Shares, and (b) two (2) designees of a majority of the Rahfaldt Shares, as members of the Board of Directors of the Company.

**3.2     Number of Directors**. During the term of this Agreement, the parties agree to vote their respective Shares and to maintain the number of directors at three. If a proposal to change the number of directors from three is submitted to the Shareholders of the Company, the Shareholders will vote all of their respective Shares against such proposal, unless the Shareholders agree that the number of directors shall be some other number, in which case the Shareholders shall vote all of

their respective Shares in favor of a proposal to change the number of directors to such other number.

4.      **RESTRICTIVE COVENANTS**.  The Company hereby covenants and agrees that, on the Effectove Date and thereafter for so long until the Shareholders otherwise agree:

4.1      Confidentiality.  Each Shareholder agrees that such Shareholder will keep confidential and will not disclose, divulge, or use for any purpose (other than to monitor its investment in the Company) any confidential information obtained from the Company, unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of this Section 4.1 by such Shareholder), (b) is or has been independently developed or conceived by the Shareholder without use of the Company's confidential information, or (c) is or has been made known or disclosed to the Shareholder by a third party without a breach of any obligation of confidentiality such third party may have to the Company; provided, however, that an Shareholder may disclose confidential information (i) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with monitoring its investment in the Company; (ii) to any prospective purchaser of any Shares from such Shareholder, other than a competitor of the Company or its Affiliate, if such prospective purchaser agrees to be bound by the provisions of this Section 4.1; (iii) to any Affiliate, partner, member, stockholder, or wholly owned subsidiary of such Shareholder in the ordinary course of business, provided that such Shareholder informs such Person that such information is confidential and directs such Person to maintain the confidentiality of such information; or (iv) as may otherwise be required by law, provided that the Shareholder promptly notifies the Company of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure.

4.2      Fiduciary Duties; Competition. Each Shareholder shall owe to the Company and its other Shareholders duties of loyalty, duty of due care, and duty to exercise proper business judgment of the type owed under the laws of the State of Iowa by corporate officers, directors, and shareholders, respectively.

4.3      Debt Incurrence; Capital Expenditures.  Without the unanimous written consent of the Shareholders, the Company and its Subsidiaries shall not create, incur, assume or suffer to exist any Indebtedness other than (i) any Indebtedness in an aggregate amount that does not exceed $100,000.00, (ii) accounts payable incurred in the ordinary course of business, (iii) equipment leases of Cyhawk in the ordinary course of business, (iv) Indebtedness of Cyhawk in connection with leases for real property locations of the Stores after any such real property is sold by Big Game; (v) Indebtedness incurred in connection with the acquisition of the land and the construction of the Store Nos. 5144, 5145, 5146, and 5147 identified on Schedule 1 attached hereto upon commercially reasonable terms from lenders that are commercial banks. Without the unanimous written consent of the Shareholders, the Company shall not incur any capital expenditure in an amount other than in the amounts and for the purposes as set forth in Schedule 2 attached hereto.

4.4      Modification of Constituent Documents.  Without the unanimous written consent of the Shareholders, the Company will not amend, modify or change (including by means of a merger) any provision of the articles of incorporation, bylaws, or the terms of any class or series

of its capital stock of the Company and Cyhawk and any provision of the articles of organization, operating agreement, or terms of membership interests of Big Game.

**4.5**   Equity Issuances.   Except for the issuances of Common Stock of the Company contemplated by Section 1.4 and Schedule C to the Contribution Agreement, the Company and its Subsidiaries shall not authorize, issue or enter into any agreement providing for the issuance (contingent or otherwise) of any equity securities, including Common Stock, any class or series of preferred stock and any options, warrants, convertible securities, or other derivative securities, without the prior authorization and approval of all of the Shareholders.

**4.6**   Affiliates. The Company and its Subsidiaries will not without the unanimous written consent of the Shareholders, directly or indirectly enter into, amend or modify any transaction or group of related transactions (including the purchase, lease, sale or exchange of properties of any kind or the rendering of any service) with any Shareholder or his or its Affiliates. The Company and its Subsidiaries will not, without the unanimous written consent of the Shareholders, offer, approve or otherwise pay or distribute aggregate compensation (including any payments or other compensation in the form of salary, any bonus, any benefit or otherwise) in respect of services provided or otherwise rendered in any fiscal year to the Shareholders or their Affiliates in excess of the amounts agreed upon by the Shareholders.

**4.7**   Fundamental Changes; Acquisitions.   Without the prior unanimous written consent of the Shareholders, the Company and its Subsidiaries shall not:

**(a)**   merge, amalgamate or consolidate with any Person if the Company or its Subsidiaries is not the surviving corporation (other than in a merger, amalgamation or consolidation involving only wholly-owned subsidiaries of the Company), engage in a reorganization, reclassify its capital stock, liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or permit there to occur any sale of equity securities of the Company and its Subsidiaries that results in a Change of Control; or

**(b)**   acquire or enter into an agreement to acquire any interest in or assets of any company or business (whether by a purchase of assets, purchase of stock, merger, amalgamation, consolidation or otherwise).

**4.8**   Sale of Assets. Without the prior unanimous written consent of the Shareholders, the Company and its Subsidiaries shall not sell, lease or otherwise dispose of any of the assets of the Company and its Subsidiaries; provided that the Company and its Subsidiaries may (i) sell, lease or otherwise dispose of (x) obsolete or worn out property or assets, whether now owned or hereafter acquired, in the ordinary course of business or (y) inventory in the ordinary course of business, and (ii) use or transfer cash or cash equivalents.

**4.9**   Nature of Business.   Without the unanimous written consent of the Shareholders, the Company and its Subsidiaries shall not make any change in the nature of its business or acquire any properties or assets that are not reasonably related to the conduct of such business activities.

**4.10**   Investments.   Without the unanimous written consent of the Shareholders, the Company and its Subsidiaries shall not, make, accrue or permit to exist any investment in any Person, including investment in any Subsidiary, other than: (a) investments in cash and cash

equivalents, (b) investments in negotiable instruments for collection, (c) advances made in connection with purchases of goods or services in the ordinary course of business, and (d) the expenditures identified in Schedule 2 in connection with Stores 5143, 5144, 5145, 5146, and 5147.

**4.11**   <u>Dividends; Distributions; Redemptions</u>.   Without the prior unanimous written consent of the Shareholders, the Company will not, at any time, declare or make or incur any liability or obligation to declare or make any Distribution and will not permit any of its Subsidiaries to incur any liability with respect to any such Distributions.  The Company will not permit any of its Subsidiaries to declare or pay Distributions, except for dividends or distributions with respect to equity securities of the Subsidiaries held by the Company.  The Company will not permit any of its Subsidiaries to redeem or otherwise acquire any of the Company's equity securities.

**4.12**   <u>Management Contracts</u>. Neither the Company nor its Subsidiaries shall enter into any management contract for the operation of any single Store having fees or compensation in excess of 5% of annual gross revenues of such Store without the prior unanimous written consent of the Shareholders. Neither the Company nor its Subsidiaries shall enter into any management contract for the operation of any single Store with any management company or manager that is not an Affiliate of Rahfaldt, Matthew Rahfaldt, or Nicholas Rahfaldt without the prior unanimous written consent of the Shareholders.

**4.13**   <u>Personal Guarantees</u>. Neither of the Jones Trusts nor any of their Affiliates shall be required to personally guaranty any Indebtedness of the Company or its Subsidiaries.

**4.14**   <u>Insolvency Proceedings</u>.   Without the prior unanimous written consent of the Shareholders, the Company and its Subsidiaries will not, at any time commence, declare, file, permit to exist, make, or cause to occur any Insolvency Proceeding of the Company or any of its Subsidiaries.

**4.15**   <u>Liquidation; Dissolution</u>. Without the prior unanimous written consent of the Shareholders, the Company and its Subsidiaries will not, at any time commence, declare, file, permit to exist, make, or cause to occur any liquidation or dissolution of the Company or any of its Subsidiaries.

**5.**   **BUY-SELL RIGHTS ON DEADLOCK.**

**5.1**   <u>Deadlock</u>. For purposes of this Agreement, a "Deadlock" of the Company shall be deemed to exist whenever the Shareholders shall fail to approve any action properly before the Shareholders (a) with respect to any matter that is the subject of any of the restrictive covenants of Section 4 of this Agreement by reason of a vote that is not unanimous, or (b) with respect to any matter that is specifically required by law to be made by the Shareholders by reason of a tie vote taken at a duly noticed and convened meeting of the Shareholders or otherwise, and in the further event that such Deadlock is not conclusively resolved and evidenced by a duly executed written consent in lieu of a special meeting of the Shareholders within thirty (30) calendar days immediately following the date of such Deadlock.

**5.2**   <u>Buy-Sell Offer</u>. In the event of a Deadlock, any Shareholder (the "Offeror") may at any time make a buy-sell offer (the "Offer") to the remaining Shareholder or Shareholders (the

"Offeree") by notifying the Offeree in writing of the exercise of this right and stating in such notice the cash price per share and other terms at which the Offeror is willing either to buy all the Shares owned by the Offeree, or to sell to the Offeree all of the Shares owned by the Offeror, with the price per share and the other terms being the same for both the purchase and the sale. Unless otherwise provided in this Agreement, the Offer shall not be revocable once the notice has been delivered to the Offeree.

       **5.3**    <u>Offeree Purchase or Sale Election</u>. Within sixty (60) days after receipt by the Offeree of the Offeror's written notice of the Offer, the Offeree shall send to the Offeror a written notice stating whether the Offeree elects (1) to purchase from the Offeror all the Shares owned by the Offeror at the price per share and other terms stated in the Offer, or to cause the Company to purchase all, but not less than all, of the shares of Stock of Offeror at such price per share; provided, however, that Offeree may elect to cause the Company to purchase the shares only if the Company may legally do so, or (2) to sell to the Offeror all the Shares owned by the Offeree at the price per share and other terms stated in the Offer. If the Offeree shall fail to notify the Offeror whether he or it elects to buy or to sell within the time period specified above, such failure shall be deemed to be an election to sell all his or its Shares to the Offeror at the price and other terms specified in the Offer. The Offeror shall be entitled to withdraw the Offer by giving the Offeree written notice of the withdrawal prior to the earlier of (1) the date the Offeree gives the Offeror written notice of his or its election to purchase or to sell pursuant to this provision, or (2) the date on which the Offeree shall be conclusively deemed to have elected to sell his or its Shares to the Offeror.

       **5.4**    <u>Company Purchase</u>. In the event that Offeree shall elect pursuant to Section 5.3 to sell all of his or its Shares to Offeror, then Offeror may elect, by notice to Offeree, to cause the Company to purchase all of the Shares instead of Offeror purchasing them, but only if the Company may legally purchase the Shares.

       **5.5**    <u>Approval of Company Purchase</u>. In the event that Offeree shall elect pursuant to Section 5.3 to cause the Company to purchase all, but not less than all, of the Shares of Offeror, or in the event that Offeror shall elect, pursuant to Section 5.4 to cause the Company to purchase all, but not less than all, of the Shares of Offeree, the Shareholder whose Shares are to be so purchased by the Company agrees, if so requested by the other Shareholder, that he or it shall vote or cause a vote to be made (as a shareholder or director, or both, of the Company) in favor of the exercise by the Company of its right to purchase all, but not less than all, of the Shares of the Shareholder whose Shares are to be so purchased by the Company pursuant to the provisions of this Section 5. In the event that for any  reason the Company is unable to purchase any Shares to be sold pursuant to this Section 5, then whoever of Offeror or Offeree that is not obligated to sell his or its Shares pursuant to this Section 5 shall be obligated to purchase any such Shares of the other Shareholder.

       **5.6**    <u>Closing</u>. Closing on the purchase of all, but not less than all, of the Shares of either Offeror or Offeree, as the case may be, under this Section 5 shall be held within thirty (30) days after the expiration of the 60-day period set forth in Section 5.3 or within thirty (30) days after the Offeree's election by notice specified in Section 5.3 hereof, whichever occurs sooner, upon the following terms and conditions: The entire purchase price for the Shares being conveyed shall be paid in cash or by good check at settlement. Upon settlement, the Shareholder whose Shares are being so conveyed shall resign as a director or officer of the Company, if and

to the extent that the Shareholder whose Shares are being so conveyed is a director or officer of the Company as of the date of the settlement.

6.      **QUALIFICATION AS A SUBCHAPTER S CORPORATION.** The Shareholders agree to be bound by the following provisions regarding the Subchapter S status of the Company:

6.1      Neither the Company nor any of the Shareholders of the Company shall take any action, or cause any circumstance to exist which would prohibit the company from being an S corporation pursuant to Code Section 1361 *et seq*., as amended from time to time or the successor provisions, or would result in the voluntary or involuntary termination of the S corporation status of the company under such statutes, or the regulations promulgated; provided, however, that the holders of 90% of the Company's issued and outstanding Common Stock, may agree to a voluntary termination of the company's S corporation status at any time.

6.2      The Company shall take steps to ensure that all of the Shareholders of the Company agree, and the Purchaser hereby agrees, that no shareholder of the company shall transfer any shares owned by such shareholder to (i) a person who, when added to the other Shareholders of the Company to exceed the number permitted by Code Section 1361(b)(1)(A), as amended from time to time or any successors thereto; or (ii) any person or entity who is an ineligible shareholder of an S corporation and/or would cause the termination of the Company as an S corporation under the provisions of Code  Section 1361 *et seq.,* as amended from time to time or any successors thereto.

6.3      The Company agrees that unless otherwise consented to in writing by the holders of 90% of the Company's issued and outstanding Common Stock, any debt instruments issued to Shareholders shall satisfy the requirements for "straight debt" as defined in Code Section 1361(c)(5)(B) and will be nontransferable during the shareholder's life unless the transferee is a person who is permitted to own shares in an S corporation.

7.      **LEGEND.**

7.1      Each certificate representing Shares now or hereafter owned by the Shareholder or issued to any person in connection with a Transfer pursuant to this Agreement shall be endorsed with the following legend:

> THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF A SHAREHOLDER AGREEMENT BETWEEN THE COMPANY AND THE HOLDER OF THESE SECURITIES, COPIES OF WHICH ARE ON FILE WITH THE SECRETARY OF THE CORPORATION.
>
> THE CORPORATION IS TAXED UNDER SUBCHAPTER S OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"). NEITHER THE CORPORATION NOR ANY OF THE SHAREHOLDERS OF THE CORPORATION SHALL TAKE ANY ACTION, OR CAUSE ANY CIRCUMSTANCE TO EXIST WHICH WOULD PROHIBIT THE CORPORATION FROM BEING AN S CORPORATION, OR WOULD RESULT IN THE VOLUNTARY OR INVOLUNTARY TERMINATION OF THE S CORPORATION STATUS OF THE CORPORATION UNDER THE

CODE, OR THE REGULATIONS PROMULGATED THEREUNDER; PROVIDED, HOWEVER, THAT THE HOLDERS OF 90% OF THE CORPORATION'S ISSUED AND OUTSTANDING COMMON STOCK, MAY AGREE TO A VOLUNTARY TERMINATION OF THE CORPORATION'S S CORPORATION STATUS AT ANY TIME. NO SHAREHOLDER OF THE CORPORATION SHALL TRANSFER ANY SHARES OWNED BY SUCH SHAREHOLDER TO (I) A PERSON WHO, WHEN ADDED TO THE OTHER SHAREHOLDERS OF THE CORPORATION TO EXCEED THE NUMBER PERMITTED BY CODE SECTION 1361(B)(1)(A), AS AMENDED FROM TIME TO TIME OR ANY SUCCESSORS THERETO; OR (II) ANY PERSON OR ENTITY WHO IS AN INELIGIBLE SHAREHOLDER OF AN S CORPORATION AND/OR WOULD CAUSE THE TERMINATION OF THE CORPORATION AS AN S CORPORATION UNDER THE PROVISIONS OF CODE SECTION 1361 ET SEQ., AS AMENDED FROM TIME TO TIME OR ANY SUCCESSORS THERETO.

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS. THEY MAY NOT BE SOLD OR OFFERED FOR SALE EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SUCH ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.

**7.2**    The Shareholders agree that the Company may instruct its transfer agent to impose transfer restrictions on the Shares represented by certificates bearing the legend referred to in Section 7.1 above to enforce the provisions of this Agreement and the Company agrees to do so. The legend shall be removed at the request of any Shareholder following termination of this Agreement.

**8.**    TERMINATION. This Agreement shall terminate and be of no further force or effect as may be agreed upon by the Shareholders.

**9.**    MISCELLANEOUS.

**9.1    Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Iowa, without regard to its principles of conflicts of laws. The parties agree that any action brought by either party under or in relation to this Agreement, including without limitation to interpret or enforce any provision of this Agreement, shall be brought in, and each party agrees to and does hereby submit to the jurisdiction and venue of, any state or federal court located in the State of Iowa.

**9.2    Mutual Waiver of Jury Trial**. As a specifically bargained inducement for each of the parties to enter into this Agreement (with each party having had opportunity to consult counsel), each party hereto expressly and irrevocably waives the right to trial by jury in any lawsuit or legal proceeding relating to or arising in any way from this Agreement or the transactions contemplated herein, and any lawsuit or legal proceeding relating to or arising in

any way to this Agreement or the transactions contemplated herein shall be tried in a court of competent jurisdiction by a judge sitting without a jury.

      **9.3**     **Amendment**.  Any provision of this Agreement may be amended or modified or the observance thereof may be waived or this Agreement terminated, only with the unanimous written consent of the Company and the Shareholders. Any amendment or waiver effected in accordance with this Section 9.3 shall be binding upon the Shareholders, their successors and assigns, the Company and each of the Shareholders. No consent of any party hereto shall be necessary to include as a party to this Agreement any Transferee required to become a party hereto pursuant to Section 9.4 hereof.  Any amendment of, or waiver with respect to the rights or obligations of the parties under, this Agreement that would obligate a party to further invest in, or provide a guarantee or other credit support for, the Company or any affiliate shall not be effected without the consent of such party.

      **9.4**     **Successors and Assigns**.  The provisions hereof shall inure to the benefit of, and be binding upon, the parties hereto and their respective successors, assigns, heirs, executors and administrators and other legal representatives.  The provisions of this Agreement shall be binding upon and inure to the benefit of the successors in interest to any of the Shares. The Company shall not permit the Transfer of any of the Shares on its books or issue a new certificate representing any of the Shares unless and until the person to whom such security is to be Transferred shall have executed a joinder agreement or written agreement substantially in the form of this Agreement, pursuant to which such person becomes a party to this Agreement and agrees to be bound by all the provisions hereof as if such person were a Shareholder or Shareholder, as applicable.

      **9.5**     **Ownership.**  Each Shareholder represents and warrants that he, she or it is the sole legal and record owner of those Shares he or she currently hold and has the authority to execute and deliver this Agreement on behalf of any beneficial owner of Shares.

      **9.6**     **Notices**.  All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient; if not, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent to the party to be notified at the address as set forth on the signature page hereof or at such other address as such party may designate by ten (10) days advance written notice to the other parties hereto.

      **9.7**     **Severability**.  In case any one or more of the provisions contained in this Agreement is for any reason held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement, and such invalid, illegal, or unenforceable provision shall be reformed and construed so that it will be valid, legal, and enforceable to the maximum extent permitted by law.

      **9.8**     **Entire Agreement**.  This Agreement constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof and no party shall be liable or bound to any other in any manner by any oral or written representations,

warranties, covenants and agreements except as specifically set forth herein and therein.  Each party expressly represents and warrants that it is not relying on any oral or written representations, warranties, covenants or agreements outside of this Agreement.

**9.9     Additional Shareholders.**  Notwithstanding anything to the contrary contained herein, if the Company issues additional shares of the Company's Common Stock after the date hereof, whether pursuant to the Purchase Agreement or otherwise, any purchaser of such shares of Common Stock may become a party to this Agreement by executing and delivering an additional counterpart signature page to this Agreement, and thereafter shall be deemed an "Shareholder" for all purposes hereunder.  No action or consent by the Shareholders shall be required for such joinder to this Agreement by such additional Holder, so long as such additional Holder has agreed in writing to be bound by all of the obligations as a "Shareholder" hereunder.

**9.10    Amendments and Waivers.**  Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance, and either retroactively or prospectively) only with the unanimous written consent of the Company and the Shareholders.  Notwithstanding the foregoing, this Agreement may not be amended or terminated and the observance of any term hereof may not be waived with respect to any Shareholder without the written consent of such Shareholder.  No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such term, condition, or provision.

**9.11    Delays or Omissions.**  No delay or omission to exercise any right, power, or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power, or remedy of such nonbreaching or nondefaulting party, nor shall it be construed to be a waiver of or acquiescence to any such breach or default, or to any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.   All remedies, whether under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative. The parties acknowledge and agree that this Agreement is specifically enforceable.

**9.12    Counterparts**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement may also be executed and delivered by facsimile signature and in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**9.13    Specific Enforcement.**  The parties acknowledge and agree that this Agreement is specifically enforceable.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

The foregoing **SHAREHOLDER AGREEMENT** is hereby executed as of the date first above written.

**COMPANY:**

BIG CYHAWK HOLDINGS, INC.


By:_____

     James Rahfaldt, President

Address:     25326 332nd Street

                Sioux City, IA 51108


**SHAREHOLDERS:**


_____

James Rahfaldt

Address:     25326 332nd Street

                Sioux City, IA 51108


TAD L. JONES SPOUSAL LIMITED ACCESS TRUST


By:_____

     Monica L. Jones, Trustee

Address:     10187 Mountain Maple Lane

                Highlands Ranch, CO 80129


MONICA L. JONES SPOUSAL LIMITED ACCESS TRUST


By:_____

     Tad L. Jones, Trustee

Address:     10187 Mountain Maple Lane

                Highlands Ranch, CO 80129

14

Execution Version

Schedule 1

Location of Company Subsidiaries' Stores

Store # 5141
3939 S. Bolger Rd.
Independence, MO 64055
Opened: 07/11/2011

Store # 5142
511 S. 32nd St
Fort Dodge, IA 50501
Opened: 05/10/2012

Store # 5143
714 S.E. Oralabor Rd.
Ankeny, IA 50021
Open: 06/01/2013 (projected)

Store # 5144
1227 Omaha Ave.
Norfolk, NE 68701
Open: 09/01/2013 (projected)

Store # 5145:  TBD

Store # 5146:  TBD

Store # 5147:  TBD

Execution Version

Schedule 2

Capital Expenditures

| Expenditure | Amount |
|---|---|
| CyHawk's purchase of the equipment for Perkins Store-Ankeny #5143 | $    125,000.00 |
| CyHawk's purchase of the equipment for Perkins – Norfolk #5144 | $    125,000.00 |
| Big Game's purchase of the land for Perkins Store #5145 | $    230,000.00 |
| CyHawk's purchase of the equipment for Perkins Store #5145 | $    125,000.00 |
| Big Game's purchase of the land for Perkins Store #5146 | $    230,000.00 |
| CyHawk's purchase of the equipment for Perkins Store #5146 | $    125,000.00 |
| Big Game's purchase of the land for Perkins Store #5147 | $    230,000.00 |
| CyHawk's purchase of the equipment for Perkins Store #5147 | $    125,000.00 |
|  |  |
| **TOTAL** | $  1,315,000.00 |

The foregoing **SHAREHOLDER AGREEMENT** is hereby executed as of the date first above written.

**COMPANY:**

BIG CYHAWK HOLDINGS, INC.

By: _James Rahfaldt_____
     James Rahfaldt, President

Address:     25326 332nd Street
                    Sioux City, IA 51108

**SHAREHOLDERS:**

_James Rahfaldt_____
James Rahfaldt

Address:     25326 332nd Street
                    Sioux City, IA 51108

TAD L. JONES SPOUSAL LIMITED ACCESS TRUST

By: _____
     Monica L. Jones, Trustee

Address:     10187 Mountain Maple Lane
                    Highlands Ranch, CO 80129

MONICA L. JONES SPOUSAL LIMITED ACCESS TRUST

By: _____
     Tad L. Jones, Trustee

Address:     10187 Mountain Maple Lane
                    Highlands Ranch, CO 80129

15

The foregoing SHAREHOLDER AGREEMENT is hereby executed as of the date first above written.

**COMPANY:**

BIG CYHAWK HOLDINGS, INC.

By:_____
     James Rahfaldt, President

Address:     25326 332nd Street
                  Sioux City, IA 51108

**SHAREHOLDERS:**

_____

James Rahfaldt

Address:     25326 332nd Street
                  Sioux City, IA 51108

TAD L. JONES SPOUSAL LIMITED ACCESS TRUST

By: _Monica L. Jones_   12-31-12
     Monica L. Jones, Trustee

Address:     10187 Mountain Maple Lane
                  Highlands Ranch, CO 80129

MONICA L. JONES SPOUSAL LIMITED ACCESS TRUST

By: _Tad L. Jones_   12-31-12
     Tad L. Jones, Trustee

Address:     10187 Mountain Maple Lane
                  Highlands Ranch, CO 80129

15